To see if HEMAP can help, you must MEET WITH A CONSUMER CREDIT COUNSELING AGENCY WITHIN 30 DAYS OF THE DATE OF THIS NOTICE.

Under the Act, you are entitled to a temporary stay of foreclosure on your mortgage for Thirty (30) days from the date of this Notice. During that time you must arrange and attend a "face-to-face" meeting with one of the consumer credit counseling agencies listed at the end of this Notice. THIS MEETING MUST OCCUR WITHIN THE NEXT THIRTY (30) DAYS. IF YOU DO NOT APPLY FOR EMERGENCY MORTGAGE ASSISTANCE, YOU MUST BRING YOUR MORTGAGE UP TO DATE.

If you meet with one of the consumer credit counseling agencies listed at the end of this notice, the lender may NOT take action against you for Thirty (30) days after the date of this meeting.

If you have tried and are unable to resolve this problem with the lender, you have the right to apply for financial assistance from the Homeowner's Emergency Mortgage Assistance Program. To do so, you must fill out, sign and file a completed Homeowner's Emergency Assistance Program Application with one of the designated consumer credit counseling agencies listed at the end of this Notice. . . . Your application MUST be filed or postmarked within Thirty (30) days of your face-to-face meeting.

YOU MUST FILE YOUR APPLICATION PROMPTLY. IF YOU FAIL TO DO SO OR IF YOU DO NOT FOLLOW THE OTHER TIME PERIODS SET FORTH IN THIS LETTER, FORECLOSURE MAY PROCEED AGAINST YOUR HOME IMMEDIATELY AND YOUR APPLICATION FOR MORTGAGE ASSISTANCE WILL BE DENIED.

(Id. Ex. C.) On December 16, 2010, Defendant sent a second, nearly identical Act 91 Notice to Plaintiff, the main difference being an adjustment for December's monthly charges. (Id. ¶ 61, Ex. D.)

### D.   Defendant's Monthly Mortgage Statement and Loan Modification Offer

On January 4, 2011, Plaintiff received his monthly mortgage bill from Defendant. (Id. ¶ 68, Ex. J.) The bill stated that Plaintiff's account remained "seriously delinquent." (Id.) Included on the bill was the following statement:

> As long as your loan remains delinquent, [Defendant] will conduct inspections of your property on a periodic basis. These inspections are provided for in your loan documents. [Defendant] will inspect your property to confirm occupancy, identify the occupants, and observe the physical condition of the property. You are responsible for paying the costs of these inspections.

(Id.) Defendant also continued to demand payment for the previously assessed $262.50 property inspection fee. (Id.)

Three weeks later, without explanation, Defendant's Home Retention Division, located in Pittsburgh, Pennsylvania, sent Plaintiff a letter informing him that his loan modification had been approved. (Id. ¶ 62, Ex. E.) The "Field Inspection Fees" were still listed at $262.50. (Id.) The letter provided details on a new monthly payment, and also advised that it would not be effective until Plaintiff took certain steps. (Id.)

### E.       Plaintiff's Requests for Mortgage Information

Plaintiff rejected the loan modification offer in a letter dated February 4, 2011. (Id. ¶ 63, Ex. F.) The letter was addressed to Defendant's Home Retention Division in Pittsburgh, the same division and location that sent the loan modification offer. (Id.) He wrote that "[b]ased on [his] prior full compliance with a trial plan agreement, [he] should have been given a modification under the federal Home Affordable Modification Program ('HAMP')." (Id.) Plaintiff requested more detailed information on the modification program Defendant was using to make its offer, as well why the offer was being limited to a variable — as opposed to fixed — interest rate modification of the amount of the mortgage. (Id.)

While awaiting a response, Plaintiff filed an application on February 10, 2011 for emergency mortgage assistance with the Pennsylvania Housing Finance Agency ("PHFA").

-10-

(Doc. No. 16, Ex. C.)  PHFA notified Defendant of the application; informed Defendant that it was prohibited under Pennsylvania law from commencing foreclosure proceedings until a decision was made on the application; and advised that it would decide eligibility for the program within sixty days.  (Id.)

Since Defendant had not responded to Plaintiff's February 4th letter, he sent a second request to the same Pittsburgh location in a letter dated March 11, 2011.  (Id. ¶ 64, Ex. G.)  In addition to making the same requests, Plaintiff informed Defendant that he was represented by counsel.  (Id.)  He also asked for "an explanation of how [it] calculated the arrears set forth in the Pennsylvania Act 91 Notices [it] sent [him], given that [he] ha[d] been paying [his] agreed upon trial payments continuously."  (Id.)  Plaintiff declared that his letter was a "Qualified Written Request" pursuant to 12 U.S.C. § 2605.  (Id.)  After failing to receive a response, he then sent a third letter to the same location, dated April 13, 2011, repeating the same requests.  (Id. ¶ 65, Ex. H.)

Several days before Defendant received the third letter, PHFA informed Defendant that it had denied the request for emergency mortgage assistance.  (Doc. No. 16, Ex. C.)  On April 20, 2011, Defendant's Fort Worth, Texas office sent Plaintiff a letter indicating that it had received his correspondence and he should "expect a complete response within twenty (20) business days."  (Id. ¶ 66, Ex. I.)  Two days later, Plaintiff received an identical letter.  (Id.)

Defendant's Simi Valley, California location — the location where Defendant initially directed Plaintiff to send his "Qualified Written Requests" to on the notice with the RESPA information — sent him a letter dated April 28, 2011, which included a loan history statement purportedly in response to his earlier requests.  (Id.; Doc. No. 16, Ex. B.)  On May 3, 2011, the

Simi Valley office sent another letter advising Plaintiff that his "request has been forwarded to the appropriate department for further research."  (Doc. No. 14 ¶ 66, Ex. I.)

Plaintiff filed this lawsuit on October 20, 2011.  As of that date Defendant still had not provided him with the information he initially requested about the loan modification offer, the calculation of the arrears and the mortgage default balances.  (Id. ¶ 67.)

## III.  LEGAL STANDARD FOR MOTION TO DISMISS

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in the Supreme Court's Opinion Ashcroft v. Iqbal, 556 U.S. 662 (2009).  First,"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 679 (citing Twombly, 550 U.S. at 556).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'–'that the pleader is entitled to relief.'"  Id. (quoting Fed. R. Civ. Proc. 8(a)(2)).

Applying the principles of Iqbal and Twombly, the Third Circuit set forth a three-part analysis that a district court in this Circuit must conduct when evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of

truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

## IV.    DISCUSSION

### A.    Legality of Property Inspection Fees

Defendant charged Plaintiff $262.50 for property inspections conducted after his loan went into default. Plaintiff was informed through pre-foreclosure notices and his monthly mortgage statement that he had to pay the amount charged for the inspections in order to cure the default. Defendant's attempt to collect the fees, and the way in which the fees were communicated to him, form the basis of Plaintiff's claims that Defendant violated the Fair Debt Collection Practices Act ("FDCPA"), the Pennsylvania Loan Interest and Protection Law, the Fair Credit Extension Uniformity Act, and Pennsylvania common law.

Defendant has moved to dismiss all claims based upon the property inspection fees. For reasons that follow, Defendant's Motion to Dismiss will be granted on all claims relating to the property inspection fees.[9] The Court will discuss each claim individually, although not exactly in

---

[9] The facts regarding the property inspection fees are the basis of the claims made in Counts I (FDCPA), III (Fair Credit Extension Uniformity Act), IV (Loan Interest and Protection

the order they are set forth in the Counts in the Amended Complaint.

### 1.    Fair Debt Collection Practices Act, 15 U.S.C. § 1692e and § 1692f

Defendant demanded payment of property inspection fees in the November 8 and December 16, 2010 pre-foreclosure notices and in the January 4, 2011 monthly mortgage invoice. Plaintiff contends in Count I of the Amended Complaint that these demands were not permitted under Pennsylvania consumer protection law, nor authorized by the mortgage agreement, and as a result Defendant's representations were false in violation of both § 1692e and § 1692f of the FDCPA.  The Court disagrees.

The FDCPA was enacted "to eliminate abusive debt collection practices by debt collectors" after Congress found "abundant evidence" of "deceptive" and "unfair" tactics being used by them.  15 U.S.C. § 1692(a), (e).  "The Act entitles consumers to certain information regarding the nature of their debts . . . and prohibits debt collectors from engaging in certain conduct."  Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 367 (3d Cir. 2011) (internal citations omitted).  "The FDCPA is a remedial statute, and . . . its language [is construed] broadly so as to effect its purposes."  Id.  It is "a strict liability statute to the extent it imposes liability without proof of an intentional violation."  Id. at 368.

Courts must use the "least sophisticated debtor" standard when analyzing communications between debt collectors and debtors.  Lesher v. Law Offices of Mitchell N. Kay, PC, 650 F.3d 993, 997 (3d Cir. 2011).  The standard is not high, but it does "'prevent liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'"  Id. (quoting Wilson

---

Law), and V (Unjust Enrichment) of the Amended Complaint.

v. Quadramed Corp., 225 F.3d 350, 354-55 (3d Cir. 2000)).  The specific provisions of the

FDCPA at issue in this case are § 1692e and § 1692f.

>    **a.      Pre-Foreclosure Notices and Mortgage Statement — § 1692e**

Section 1692e prohibits debt collectors from using "any false, deceptive, or misleading

representation or means in connection with the collection of any debt."  Under § 1692e(2), it is a

violation to make any "false representation of — (A) the character, amount, or legal status of any

debt; or (B) any services rendered or compensation which may be lawfully received by any debt

collector for the collection of a debt."  "The language of this provision creates a straightforward,

objective standard."  Glover v. Fed. Deposit Ins. Corp., 698 F.3d 139, 149 (3d Cir. 2012).

"'A debt collection letter is deceptive where it can be reasonably read to have two or more

different meanings, one of which is inaccurate.'"  Rosenau v. Unifund Corp., 539 F.3d 218, 222

(3d Cir. 2008) (quoting Brown v. Card Serv. Center, 464 F.3d 450, 455 (3d Cir. 2006)).  For

example, the Third Circuit has held that a debt collector would violate § 1692e if it "assert[ed]

that it *could* take [a legal] action that it had no intention of taking and has never or very rarely

taken before."  Brown, 464 F.3d at 455 (3d Cir. 2006).  In another instance, a debt collection letter

signed by the collector's "Legal Department," which was comprised solely of non-lawyers, was a

violation of § 1692e because it falsely implied lawyers had sent the letter.  Rosenau, 539 F.3d at

220-23; see also Lesher, 650 F.3d at 1003 (finding law firm debt collection letter violated § 1692e

because firm name and logo printed at the top of the letter "falsely impl[ied] that an attorney,

acting as an attorney, [was] involved in collecting" the debt); Crossley v. Lieberman, 868 F.2d

566, 571 (3d Cir. 1989) (debt collector's letter violated § 1692e by threatening "to take action

'within one week' . . . [which collector] knew because of [Pennsylvania law] he was not permitted

to institute within one week").

In this case, Defendant informed Plaintiff on multiple occasions that he owed $262.50 for property inspections.  The falsity of these demands allegedly arises from the limitations placed on debt collectors by the Pennsylvania Loan Interest and Protection Law (also known as "Act 6").  Act 6 requires mortgagees or lenders to send notice to delinquent borrowers of their intention to foreclose.  Section 403(c) of the Act requires, among other things, the following:

> The written [pre-foreclosure] notice shall clearly and conspicuously state:
>
> (1) The particular obligation or real estate security interest;
> (2) The nature of the default claimed;
> (3) The right of the debtor to cure the default *as provided in section 404* of this act and exactly what performance including what sum of money, if any, must be tendered to cure the default;
> (4) The time within which the debtor must cure the default . . . .

41 Pa. Cons. Stat. § 403(c) (emphasis added).  Section 404(b) reads, in relevant part, that:

> To cure a default under this section, a residential mortgage debtor shall:
>
> (1) Pay or tender . . . all sums which would have been due at the time of payment or tender in the absence of default . . . ;
>
> (2) Perform any other obligation which he would have been bound to perform in the absence of default . . ., if any;
>
> (3) Pay or tender . . . *the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment*.
>
> (4) Pay any reasonable late penalty, if provided for in the security document.

Id. § 404(b) (emphasis added).  Thus, while Section 403(c)(3) directs lenders to state the exact amount needed to cure the default, Section 404(b) limits that amount to certain items.

Pennsylvania courts have not set forth a test for determining whether a specific cost is

reasonable in a proceeding to foreclosure.  The ability of lenders to pass-through property

inspection costs to defaulted borrowers has been addressed, however, by the United States

Bankruptcy Court for the Eastern District of Pennsylvania.  For example, in one case, a residential

mortgage lender sought to collect $144 in property inspection fees as part of a debtor's Chapter 13

reorganization plan.  In re Sacko, 394 B.R. 90, 104 (Bankr. E.D. Pa. 2008).  In analyzing the

lender's claim, the court first looked to the mortgage agreement, noting the mortgage language

was "broad enough to encompass property inspections." Id. at 105.  The court noted, however,

"the mere fact that a mortgage loan is delinquent, by itself, does not establish the necessity for

property inspections at the borrower's expense." Id.  A court must examine the facts of each case.

See id.  In Sacko, the court did not allow the collection of fees because the lender failed to present

any evidence that the inspections were necessary after it was shown that the lender was in constant

contact with the borrower during the foreclosure process.  Id. at 105-06.

A different conclusion was reached In re Cervantes, 67 B.R. 816 (Bankr. E.D. Pa. 1986).

In Cervantes, the court held that the lender was entitled to $106.80 in property inspection fees

because 41 Pa. Cons. Stat. § 404(b)(3) and the mortgage agreement allowed such recovery.  Id. at

821.  There was no evidence in the case that the fee was unreasonable.  Id.

In another case, the bankruptcy court denied the lender recovery of property inspection

fees because the fees were not authorized under the mortgage agreement.  In re Burwell, 107 B.R.

62, 66 (Bankr. E.D. Pa. 1989).  The court said it could "see little legal necessity for the

mortgagee's making superficial periodic inspections to a mortgaged premises.  Certainly, such

inspections are unlikely to garner information which . . . [is] essential to proper prosecution of a

foreclosure suit." Id. at 66.  The court did note, however, that it was "not foreclosing the

-17-